IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| NATHAN HARTIG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 13-1199-CV-W-REL-SSA |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Nathan Hartig seeks review of the final decision of the Commissioner of Social
Security denying plaintiff's application for disability benefits under Titles II and XVI of the
Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in discounting the opinion of
plaintiff's treating psychiatrist, Enrique Dos Santos, M.D., who found that plaintiff would likely
miss one to two days of work per month due to his mood swings from bipolar disorder. I find
that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is
not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the
decision of the Commissioner will be affirmed.

## I. BACKGROUND

On May 2, 2011, plaintiff applied for disability benefits alleging that he had been
disabled since April 30, 2010. Plaintiff's disability stems from bipolar disorder and anxiety.
Plaintiff's application was denied on June 17, 2011. On August 30, 2012, a hearing was held
before an Administrative Law Judge. On September 8, 2012, the ALJ found that plaintiff was
not under a "disability" as defined in the Act. On October 17, 2013, the Appeals Council
denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final
decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."  Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.    BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental

2

impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.      Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes = go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.    THE RECORD

The record consists of the testimony of plaintiff and vocational expert Dr. John McGowan, in addition to documentary evidence admitted at the hearing.

## A.    ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

### Earnings Record

The record establishes that plaintiff earned the following income from 2000 through 2012:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 2000 | $ 2,571.73 | 2007 | $ 23,081.13 |
| 2001 | 0.00 | 2008 | 26,219.87 |
| 2002 | 2,484.71 | 2009 | 11,985.83 |
| 2003 | 9,268.44 | 2010 | 1,166.70 |
| 2004 | 11,894.01 | 2011 | 0.00 |
| 2005 | 14,053.86 | 2012 | 0.00 |
| 2006 | 23,072.62 | | |

(Tr. at 171).

### Disability Report - Field Office

On May 11, 2011, Interviewer L. Engelbrecht met face to face with plaintiff and observed that plaintiff had no difficulty with hearing, reading, breathing, understanding, coherency, concentrating, talking, answering, sitting, standing, walking, seeing, using his hands, or writing (Tr. at 187-189).  He was described as "neat, clean, pleasant, able to answer questions easily, including able to give approximate dates" (Tr. at 188).

4

**Function Report Adult - Third Party**

In a Function Report dated May 17, 2011, plaintiff's significant other, Jennifer Jakubetz, reported that plaintiff "escapes into the computer," paces, withdraws from others while watching television or while just sitting there (Tr. at 198). Ms. Jakubetz noted that she has to write for plaintiff due to his shaking hands. He needs a verbal reminder to care for his personal needs and grooming, and he also needs a reminder to take his medication (Tr. at 200). He is able to prepare his own meals (Tr. at 200). Plaintiff is able to do dishes, vacuum and mow the lawn (Tr. at 200). He goes out once or twice a day, and is able to walk, drive a car or ride in a car (Tr. at 201). He is able to go out alone (Tr. at 201). He shops in stores for food and clothing up to twice a week (Tr. at 201). It takes him an hour to shop for food, a few hours to shop for clothing (Tr. at 201). Plaintiff spends his day watching television, playing on the computer and playing video games (Tr. at 202). Plaintiff talks on the phone and he plays video games with his friends three or four times a week (Tr. at 202). He goes to his friend's house, doctor appointments and stores on a regular basis (Tr. at 202).

Ms. Jakubetz reported that plaintiff's impairments affect his ability to understand, talk, use his hands, follow instructions, complete tasks, get along with others, remember and concentrate (Tr. at 203). His impairments do not affect his ability to lift, sit, climb stairs, squat, kneel, stand, bend, hear, reach, walk, or see (Tr. at 203). He has trouble using his hands because they shake (Tr. at 203). Plaintiff was fired from a job at Café Petite Four, Inc., for anger issues (Tr. at 204). He wakes up in rages, is easily stressed, and does not handle changes in routine well (Tr. at 204).

**Function Report - Adult**

In a Function Report dated May 18, 2011, plaintiff described his day as follows: "Watch TV, pace around house, feed cats & take my mother-in-law's dogs out, eat, watch more

TV or get on computer, may go to store or friend's house, play video games" (Tr. at 225). Plaintiff is able to prepare his own meals (Tr. at 227). He is currently able to mow the lawn on a riding lawn mower, vacuum, and do dishes (Tr. at 227). He goes out a few times a day and is able to walk, ride in a car or drive a car (Tr. at 228). He is able to go out alone (Tr. at 228). He shops in stores for food (for an hour at a time) and for clothing (for a few hours at a time) (Tr. at 228). Plaintiff's hobbies are video games, watching television, and getting on the computer (Tr. at 229). He plays video games and visits with friends or talks to them on the phone (Tr. at 229).

Plaintiff's impairments affect his ability to talk (his mind cannot stay focused or find the words to explain things), remember, complete tasks, concentrate, understand, follow instructions, use his hands, and get along with others (Tr. at 230). His impairments do not affect his ability to lift, squat, bend, stand, reach, walk, sit, kneel, hear, climb stairs, or see (Tr. at 230).

## Disability Report

In an undated Disability Report plaintiff reported that he stopped working on April 30, 2010 "because of other reasons" (Tr. at 191). When asked to explain why he stopped working, he wrote, "Fired when I didn't go to work one day. I was under a 24 hour hold as I was accused of trying [to pass] a counterfeit $50 dollar bill I had gotten from the bank. I was fired for not going in to work that day."

## Disability Report - Appeal

In this form, dated July 23, 2011, plaintiff reported that his hands have stopped shaking (Tr. at 252).

*B.*     *SUMMARY OF MEDICAL RECORDS*

On July 27, 2009, plaintiff was seen at Research Medical Center after having been in a car accident (Tr. at 436-442). Plaintiff reported he was in an accident while driving to work after taking 2 Valium and 2 hits off a marijuana joint (Tr. at 442). He reported being a current smoker and using marijuana "socially."

On July 30, 2009, plaintiff went to the emergency room at Research Medical Center and requested pain medication (Tr. at 444-445). Plaintiff was given a prescription for Percocet (narcotic).

On November 4, 2009, plaintiff saw Lee Weng, M.D., complaining of frustration, panic and short temper (Tr. at 275-278). Plaintiff had last been seen nine years earlier and at the time was on Lithium (mood stabilizer) and Depakote (mood stabilizer). He was noted to have changes and/or problems with home, family, work, legal, depression, bipolar disorder (moody, diagnosis of bipolar in the past), alcohol (2 beers every now and then), and sleep (although his sleep was noted to be fair). He was not having any problems or changes with medication -- he was on "no meds now." He also was noted to have "no health issues." Plaintiff was observed to have appropriate appearance, a cooperative attitude, normal speech, intact thought process, no hallucinations, no delusions, no suicidal ideation, no homicidal ideation. He was calm and fully oriented. His long and short term memory were normal. His cognitive functioning was normal including general knowledge, IQ, serial sevens/calculations and abstract thinking. He was moody and had poor insight/judgment. He was assessed with bipolar not otherwise specified,[1] panic disorder,[2] and a GAF of 50-70.[3] Plaintiff was given prescriptions for

--------

[1]"Bipolar disorder, formerly called manic depression, causes extreme mood swings that include emotional highs (mania or hypomania) and lows (depression). When you become depressed, you may feel sad or hopeless and lose interest or pleasure in most activities. When your mood shifts in the other direction, you may feel euphoric and full of energy. Mood shifts may occur only a few times a year or as often as several times a week. Although bipolar

Depakote (mood stabilizer) and Klonopin[4] and to return in one week.

On December 2, 2009, plaintiff saw Dr. Weng for a follow up (Tr. at 278). "Looks well + feels well. No med side effects. Doing well." His medications were continued and he was told to return in two months.

On December 14, 2009, plaintiff saw Dr. Weng (Tr. at 278). "Looks well, but not feeling well. Got fired today + losing home ins. No meds side effects. No [suicidal ideation]. Step grandmother is taking pt to court. Was in MVA [motor vehicle accident] the other day." His dose of Klonopin was increased and he was told to return in one month.

On January 14, 2010, plaintiff saw Dr. Weng (Tr. at 278). "Looks well, feeling well. Taking care of his ill father. Lost house, moving out. No meds side effects. No SI [suicidal ideation]. Step grandmother is taking over everything. Sued by the city for back taxes. Wants antidepressant." Dr. Weng prescribed Effexor XR (antidepressant) and continued plaintiff's

---

disorder is a disruptive, long-term condition, you can keep your moods in check by following a treatment plan. In most cases, bipolar disorder can be controlled with medications and psychological counseling (psychotherapy)."
http://www.mayoclinic.org/diseases-conditions/bipolar-disorder/basics/definition/con-200 27544
        The designation abbreviated NOS -- not otherwise specified -- can be used when the mental disorder appears to fall within the larger category but does not meet the criteria of any specific disorder within that category.

    [2]A psychiatric disorder in which debilitating anxiety and fear arise frequently and without reasonable cause.

    [3]A global assessment of functioning of 61 to 70 means some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.
        A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

    [4]Also called Clonazepam, this medication is a schedule IV controlled substance (benzodiazepine) used to treat panic disorder and anxiety.

8

other medications.

On March 11, 2010, plaintiff saw Dr. Weng (Tr. at 279). "Looks well, feels well. Doing well. Has to move to a friend's, 'lost it to step G. mother." No meds side effects." Plaintiff's Effexor XR (antidepressant), Depakote (mood stabilizer) and Klonopin (anti-anxiety) were continued.

On April 9, 2010, plaintiff was seen at Research Medical Center for abrasions to his face and right hand after having gotten into a fight at O'Reilly Auto Parts (Tr. at 432-435). He was given a prescription for Vicodin (narcotic).

April 30, 2010, is plaintiff's alleged onset date.

On May 6, 2010, plaintiff saw Dr. Weng (Tr. at 279). "Looks well, feels well, but has 'bad allergy.' Father died from liver failure. No SI. No meds side effects." Plaintiff's medications were continued.

On June 3, 2010, plaintiff saw Dr. Weng (Tr. at 279). "Looks well. Working now but 'tired from working, have not work[ed] for a long time.' Moving too, 'too much stress, burying father too.' Wants Xanax[5] for a month." This is the complete medical record. It does not indicate whether plaintiff was prescribed Xanax.

On June 6, 2010, plaintiff was seen at Research Medical Center (Tr. at 427-429). Plaintiff tripped and fell with a broken light bulb in his hand. Plaintiff reported being a current smoker, and under alcohol was written, "2 shots." He had a superficial laceration of his left hand and knee. He was given a prescription for Vicodin (narcotic).

On August 16, 2010, plaintiff saw Dr. Weng (Tr. at 279). "Looks well. Feels well. Doing better. Moved in with a friend. Looking for a job." This is the entire medical record.

---

[5]Also called Alprazolam, this is a schedule IV controlled substance (benzodiazepine) used to treat anxiety.

On August 20, 2010, plaintiff was seen at Research Medical Center (Tr. at 424-425). "Started new job this week, labor, carrying heavy bags". He was diagnosed with muscle strain after heavy work and was told to take over-the-counter Motrin or Aleve as needed.

On October 11, 2010, plaintiff saw Dr. Weng (Tr. at 279). "Looks well. Feels OK. Doing OK. But wife lost her job, 'tight' living situation with friend." This is the entire medical record.

On January 11, 2011, plaintiff saw Dr. Weng (Tr. at 279). "Looks well. Feels well. Doing OK. Moving to Columbia, MO. Quit Depakote [mood stabilizer'. Prozac [antidepressant] for Effexor [antidepressant] '$4 list.'" This is the entire medical record.

On February 23, 2011, plaintiff saw Enrique Dos Santos, M.D., for a psychiatric evaluation (Tr. at 363-365). Plaintiff said he had been referred by his mother-in-law, had recently moved to Columbia, and was looking for work. "Mr. Hartig says that he was diagnosed with Bipolar Disorder in Kansas City when he was 14-15 years old. He has been on medication. He has been on Lithium [mood stabilizer] for a long time. Presently on Depakote [mood stabilizer], Klonopin [anti-anxiety] 0.5 mg, Prozac [antidepressant] 20 mg twice a day. He says that he was also put on Xanax [anti-anxiety] by Dr. Lee Weng in Independence, MO." Plaintiff reported that he used marijuana and cocaine once. He smokes a half a pack of cigarettes per day. He did a lot of drinking when he was 21 years old.

> Mental Status Exam: . . . He had good eye contact. His speech was normal in volume, tone, and rate. Attention and motor activity within normal limits at this time. Thoughts organized, coherent. He says that his thoughts are 'way too fast'. He denied hallucinations. No evidence of delusions. He says that he is either very happy or sad. Short episodes of mood swings. He says that he is irritable. He denied history of suicide attempts or thoughts. He says that getting to sleep is very difficult. He says that he sleeps 6-8 hours. Appetite good. He complains of feeling tired, no energy. He denied OCD [obsessive-compulsive disorder] symptoms. He says that he has problems with anxiety. He says that he has had panic attacks; chest tight, stomach hurts, shaky. Alert, oriented as to person, place, time, and circumstances. Memory preserved for past and recent events. Intelligence seems of average range. Insight and judgment good.

Dr. Dos Santos assessed bipolar disorder not otherwise specified, anxiety disorder not otherwise specified, and a GAF of 70 (mild symptoms).  He prescribed Depakote (mood stabilizer), Prozac (anti-depressant) and Clonazepam (anti-anxiety).

On March 24, 2011, plaintiff saw Dr. Dos Santos (Tr. at 362).  Plaintiff said "his mood is pretty good.  He says that sometimes has some downs but not really bad. . . .  He says that he is applying to restaurants.  Thoughts organized. . . .  Mood and affect both appropriate.  No hallucinations or delusions."  Dr. Dos Santos assessed "mood stable GAF 70."  He told plaintiff to continue on his same medications.

On April 8, 2011, plaintiff went to the emergency room after having an accident while riding a bicycle (Tr. at 344-356).  He denied anxiety, depression and sleeping problems (Tr. at 344).  He was observed to be cooperative with appropriate mood and affect (Tr. at 345).  Plaintiff was given IV morphine.  X-rays were taken and his ER diagnosis was likely radial head (elbow) fracture and ankle sprain.  He was given a prescription for Vicodin (narcotic) one tablet every six hours, and told to follow up with orthopaedics.



On April 11, 2011, plaintiff went to the emergency room and said he had been taking two Vicodin every four hours and it was not helping his right elbow pain (Tr. at 336-343).  He was told to discontinue Vicodin and was prescribed Percocet (narcotic).  He was told to make an appointment with orthopedics.

On April 13, 2011, plaintiff saw David Volgas, M.D., an orthopedic specialist, for a follow up on his likely radial head fracture and ankle sprain (Tr. at 331-335).  "He was riding his bicycle and went around a curve too fast and fell off, hitting the draining ditch."  "Radiographs do not demonstrate a nondisplaced radial neck fracture.  [And] I think this is

11

truly just an ankle sprain." Plaintiff was given exercises to do at home.

On April 21, 2011, plaintiff did not show up for his appointment with his psychiatrist (Tr. at 362).

On April 23, 2011, plaintiff was hospitalized at University of Missouri Hospital in Columbia after an attempted suicide (Tr. at 282-302). Plaintiff reported having taken 90 1mg pills of Klonopin (anti-anxiety) at 10:00 p.m and also took 20 to 30 Prozac (antidepressant) pills. "This was not witnessed. The patient was very alert and oriented for taking this large amount of medication." Plaintiff was given activated charcoal and admitted. He reported that his mom made him throw up 45 minutes after ingestion. Plaintiff said he had depression but no other condition, and he denied any relevant family history. He reported being a smoker. Plaintiff was able to respond to all questions appropriately. His urine tested positive for marijuana and benzodiazepine (Klonopin is a benzodiazepine).

Plaintiff was treated by Deepika Jain, M.D. "Per patient, he took 90 pills of Klonopin 1 mg each at 10:00 p.m. this evening. The patient states that he also took some Prozac, though he mentioned this as an afterthought. . . . The patient states that he is having more and more stress at home and is just 'angry'. The patient states that he wanted to kill himself when he took these medications. . . . Upon arrival to the emergency room, the patient was alert and oriented x3 and was answering appropriate questions. . . . The patient did not have a decreased level of consciousness prior to Narcan[6] being given. By the time this author interviewed the patient, the patient was alert and oriented x3, and conversing easily. The patient states that he moved here 2-3 months ago from Kansas City and that he has not been able to find a job in the past year. The patient has financial stresses and has stresses at home

_____

[6]Due to a "questionable history of taking 6 Norco [narcotic] today." (Tr. at 295). Narcan is an opioid antagonist used to help reverse the effects of narcotic medication.

12

which have contributed to his desire to commit suicide.  The patient denies any previous history of suicide attempts, though wife who is at the bedside states that he told her in the past that he had tried to commit suicide (unclear of the method). The patient has been under the care of a psychiatrist for the past 10 years for anxiety, bipolar, and ADD. . . .  The patient apparently had a recent bike accident in which he sprained his elbow and his ankle. The patient states this is why he is taking the Norco [narcotic]."

Plaintiff reported smoking 1 to 1 1/2 packs of cigarettes per day for the past 12 years and admitted to occasional alcohol use.  He reported having been addicted to methamphetamine from age 15 to17 and was addicted to Oxycodone (narcotic) from 2006 through 2010.  He reported being "clean" for the past year.  Plaintiff was noted to be somewhat annoyed and "at times shouting during the interview."

Plaintiff reported that the day before, he had gotten into a fight with someone at a gas station.  After that he went home and had an argument with his wife regarding his lack of a job.  Plaintiff was living with seven other people and this added to his stress.  Finally, the first anniversary of his father's death was coming up soon.  Plaintiff felt guilty for not having a job and not being able to support his family.  He had normal energy and appetite but poor concentration.  "He reported having racing thoughts and easy distractability.  He denied any other signs of mania."  Plaintiff reported panic attacks once a week.  "When asked if he has any suicidal ideations, he tried to evade the answer and stated 'I don't know'."

Plaintiff reported seeing Dr. Weng in Kansas City and since moving to Columbia three months earlier had been seeing Dr. Dos Santos.  "He had his appointment with his psychiatrist last Friday, but he did not keep the appointment."  Plaintiff was assessed with bipolar affective disorder, type 1, current episode depressed; anxiety disorder not otherwise specified; and

13

attention deficit disorder by history.  His GAF was 35.[7]

Plaintiff was discharged on April 25, 2011.  He was calm and cooperative.  His thought process was linear, organized and goal directed.  Insight was fair, judgment was poor.

On May 2, 2011, plaintiff applied for disability benefits.

On May 6, 2011, plaintiff saw Dr. Dos Santos (Tr. at 362).  Plaintiff reported having been admitted to the hospital "for less than 96 hours.  He says that he was depressed and took an overdose of his medications. . . .  His medication was changed to Lithium [mood stabilizer] and Citalopram [also called Celexa, an antidepressant]."  Dr. Santos observed that plaintiff's thoughts were organized.  Plaintiff denied hallucinations and delusions.  His mood and affect were both appropriate.  Plaintiff denied suicidal ideation or plan.  Dr. Dos Santos assessed "no suicidal plans".  He continued plaintiff on Lithium and Citalopram.

On May 10, 2011, plaintiff saw David Volgas, M.D., for a follow up on his elbow injury (Tr. at 327-328).  He had normal range of motion and normal strength.  He had no tenderness.

On May 24, 2011, plaintiff went to the emergency room where he was seen by James Osgood, M.D., for abdominal pain (Tr. at 304-327).  Plaintiff was observed to be cooperative with appropriate mood and affect.  Plaintiff reported smoking 1 1/2 packs of cigarettes per day.  On a CT scan a nonobstructive kidney stone was observed but was noted to be unchanged.  "Based on your visit today, the exact cause of your abdominal (stomach) pain is not certain.  Your condition does not seem serious now".  Plaintiff was prescribed Norco (narcotic) for pain.

---

[7]A global assessment of functioning of 31 to 40 means some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

On May 27, 2011, plaintiff saw Dr. Dos Santos (Tr. at 361, 387). Plaintiff reported that he had been in the hospital for two days for abdominal pain. He reported having had a lot of anxiety -- that his anti-anxiety medication was not working. However, the Citalopram (antidepressant) was "working well." Plaintiff complained of a hand tremor due to Lithium. He was assessed with Lithium tremor and anxiety with a GAF of 68 (mild symptoms). Dr. Dos Santos discontinued plaintiff's Lithium and increased his anti-anxiety medication.

On June 17, 2011, Joan Singer, Ph.D., a non-examining psychologist, completed a Psychiatric Review Technique (Tr. at 367-378). Dr. Singer found that plaintiff had bipolar disorder and anxiety. She found that plaintiff suffered from mild restriction of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation. "His impairments are significant but they do not limit claimant's functioning to the degree that would preclude at least simple, repetitive jobs."

That same day Dr. Singer completed a Mental Residual Functional Capacity Assessment (Tr. at 379-381). She found that plaintiff was not significantly limited in the following:

- The ability to remember locations and work-like procedures

- The ability to understand and remember very short and simple instructions

- The ability to carry out very short and simple instructions

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to sustain an ordinary routine without special supervision

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to make simple work-related decisions

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to interact appropriately with the general public

- The ability to ask simple questions or request assistance

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

- The ability to set realistic goals or make plans independently of others

She found that plaintiff was moderately limited in the following:

- The ability to understand and remember detailed instructions

- The ability to carry out detailed instructions

- The ability to maintain attention and concentration for extended periods

- The ability to respond appropriately to changes in the work setting

On June 20, 2011, plaintiff saw Dr. Dos Santos (Tr. at 387). Plaintiff said his mood was OK but he liked the way he felt on the Lithium (mood stabilizer). He said he was not sleeping very well. Dr. Dos Santos observed that plaintiff's thoughts were organized. His mood was mildly depressed. He was assessed with "no tremor, dysphoric mood" and a GAF of 70. Dr. Dos Santos prescribed Lamictal (mood stabilizer) and continued plaintiff on his other medications.

On July 18, 2011, plaintiff saw Dr. Dos Santos (Tr. at 386). Plaintiff said his mood was pretty stable and that "he doesn't get mad for no reason." He was not sleeping very well. Dr.

16

Dos Santos observed that plaintiff's thoughts were organized, mood and affect were appropriate. He assessed "stable mood" with a GAF of 74.[8]

On August 12, 2011, plaintiff saw Dr. Dos Santos (Tr. at 386). Plaintiff said he was "doing alright." The Lamictal seemed to be working OK. Plaintiff's thoughts were organized, his mood and affect were appropriate "although sometimes sad." He assessed dysphoric mood with a GAF of 70 (mild symptoms). He increased plaintiff's Citalopram (antidepressant).

On September 12, 2011, plaintiff saw Dr. Dos Santos (Tr. at 385). He said his mood was a little better since his Citalopram was increased. Dr. Dos Santos observed that plaintiff's thoughts were organized, "mood and affect both appropriate at this time. He says that he is sleeping pretty good with the Citalopram." Plaintiff said he was not working that he was taking care of the house and the cooking. He complained of increased anxiety. Dr. Dos Santos assessed anxiety with a GAF of 68 (mild symptoms). He continued plaintiff on the same medications.

On November 10, 2011, plaintiff saw Dr. Dos Santos (Tr. at 385). Plaintiff said that "overall he is OK. But he says that he still feels depressed and anxiety." Dr. Dos Santos observed that plaintiff's thoughts were organized, his mood was anxious and depressed. Plaintiff denied suicidal ideas or plans. Dr. Dos Santos assessed dysphoric mood with a GAF of 65. He increased plaintiff's Celexa (antidepressant).

On December 1, 2011, plaintiff saw Dr. Dos Santos and said Buspar[9] did not work for him (Tr. at 384). "The increase in Effexor XR [antidepressant] to 150 mg seems to help."

---

[8]A global assessment of functioning of 71 to 80 means that if symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork).

[9]Buspar, also called Buspirone, is an anti-anxiety medication unrelated to benzodiazepines.

17

Plaintiff reported a lot of anxiety and panic attacks once a day or so. Dr. Dos Santos observed that plaintiff's thoughts were organized. He had no hallucinations or delusions. His mood was anxious. He assessed panic attacks with a GAF of 68 (mild symptoms). He told plaintiff to discontinue the Buspar and he prescribed Clonazepam (benzodiazepine for anxiety), Effexor XR (antidepressant), and Lamictal (mood stabilizer).

On January 2, 2012, plaintiff saw Dr. Dos Santos (Tr. at 384). Plaintiff reported that his panic attacks were better but he had been taking Clonazepam three times a day instead of twice a day as prescribed. Plaintiff reported having been a little manic for two or three days, "but now his mood is good." Plaintiff's thoughts were noted to be organized with no hallucinations or delusions. He was assessed with "better mood" with a GAF of 75 (no symptoms). He was told to continue his present medications; however, it is unclear whether Dr. Dos Santos recommended that plaintiff take the Clonazepam only twice a day or whether he permitted plaintiff to increase the dose as he had done on his own.

On January 25, 2012, plaintiff saw Joyce Harter, a nurse practitioner in the Urology Department complaining of severe abdominal pain (Tr. at 395-398). Plaintiff reported having smoked a pack of cigarettes per day for the past 13 years. In a review of symptoms, plaintiff denied mood swings (Tr. at 397). He was observed to be alert and fully oriented. Plaintiff was assessed with chronic inflammation of the prostate and was prescribed Bactrim (antibiotic) and Ultram.[10]

On February 12, 2012, plaintiff was seen by Ajay Aggarwal, M.D., an orthopedic specialist, as a new patient for evaluation of hip pain (Tr. at 388-394, 414-419). Plaintiff reported that he was "on disability for bipolar/anxiety" (Tr. at 393). "Patient states that his right hip has been getting worse over the last month ever since he was working on his friend's

---

[10]Also called Tramadol, this is a narcotic-like pain reliever.

18

brakes." Plaintiff said his pain was worse with activity. He had a cane for walking "long distances only." X-rays showed well healed femoral fracture from his 2003 accident. The hardware was intact and there were no obvious signs of failure, no arthritis, joint space was well preserved. "We discussed with the patient that he has no hardware failure and no bony issues at this time. We see no obvious bony reason for his pain. Patient likely has abductor sprain versus chronic atrophy. We gave him some hip exercises to do."

On March 22, 2012, plaintiff, accompanied by a guard, saw David Chang, M.D., after having been referred by Dr. Blackburn in the medical department of the Boone County Jail (Tr. at 398-402). "Patient was involved in an altercation on 3/15/12. He was hit several times in the face at that time." Plaintiff reported no alcohol use in the past seven days, but he admits to "illicit drugs/Rx misuse past 12 months" (Tr. at 400). Plaintiff was smoking one pack of cigarettes per day. He was observed to have normal mood and affect. Dr. Chang reviewed plaintiff's CT scan from March 15, 2012. He assessed left orbital floor fracture and mild double vision. "Swelling within the orbit of the eye may be causing the diplopia [double vision], although mild entrapment of the inferior rectus muscle cannot be ruled out. If entrapment continues, consideration for surgical repair was discussed."

On March 29, 2012, plaintiff, accompanied by a guard, saw Dr. Chang, for a follow up (Tr. at 403-404). He was given a prescription for Lortab (narcotic) and told to follow up in two weeks.

On April 3, 2012, plaintiff did not show for his appointment with Dr. Dos Santos (Tr. at 383).

On April 13, 2012, Dr. Chang performed surgery to repair plaintiff's eye injury (Tr. at 420-422).

19

On April 17, 2012, plaintiff saw Dr. Dos Santos (Tr. at 383). Plaintiff said he was "not doing very well. He got into a fight with his wife's step father and had to have an eye surgery. They rebuilt the eye socket." Plaintiff's wife was pregnant with their first child. He was staying in a Motel 6. He and his wife were planning to meet to talk. He said he did not know why he got into a fight. Plaintiff said the police were called and he was arrested and spent two weeks in jail. "He went out and file[d] three applications for jobs. He said first he needs to find a job instead of waiting for [illegible]." Dr. Dos Santos observed that plaintiff's thoughts were organized. He had no hallucinations or delusions. His mood and affect were appropriate. "He keeps wondering what happened to him but he was angry - he denied use of alcohol or drugs." Dr. Dos Santos assessed, "got into a fight" with a GAF of 65. He continued plaintiff on the same medications.

On April 18, 2012, plaintiff saw Dr. Chang for a follow up (Tr. at 405-406). "Patient states that his car was broken into while he was staying at the motel area. He therefore lost all his prescriptions as well as other personal possessions." He rated his pain a 5/10. He was given a prescription for Lortab (narcotic).

On April 21, 2012, plaintiff went to the emergency room complaining of eye pain (Tr. at 409-413). "He was seen in the ENT clinic on 4/18 and given rx for lortab 7.5 #20. He states this controls his pain significantly, but he is now out." He was observed to be cooperative, alert and fully oriented. Plaintiff was given another prescription for Lortab (narcotic).

On April 30, 2012, plaintiff saw Dr. Chang for a follow up (Tr. at 407-408). Plaintiff reported that his pain had been controlled with non-steroidal anti-inflammatories -- he had not used a narcotic since the previous week. He had no double vision.

On May 14, 2012, plaintiff saw Dr. Dos Santos and reported that he had moved to Belton, Missouri (Tr. at 382). "He is going to have a disability appeal court date in August." Dr. Dos Santos observed that plaintiff's thoughts were organized, his mood was depressed, his affect was appropriate. Plaintiff said he felt depressed and anxious but had no suicidal thoughts. He was assessed with depressed mood GAF 62. Dr. Dos Santos increased plaintiff's dose of Effexor (antidepressant).

On July 24, 2012, plaintiff saw Dr. Dos Santos for a follow up (Tr. at 382). Plaintiff said he was doing alright. "He says that he is staying [with] his sister-in-law in Kansas City, but he doesn't know if the probation officer is going to let him stay there." His thoughts were organized and coherent. He had no hallucinations or delusions. "Mood more stable. Affect appropriate." Dr. Dos Santos assessed plaintiff as "stable" with a GAF of 68. He continued his same medications.

On September 4, 2012, Dr. Dos Santos wrote a letter to plaintiff's disability lawyer (Tr. at 446). The letter states in its entirety:

> Nathan Hartig has been diagnosed and is being treated for Bipolar Disorder, mixed, and anxiety disorder. He is likely to have episodes with changes in his mood, either depression or elated mood. Also, he has episodes of anxiety. I estimate that he might miss 1 or 2 days of work per month when these episodes happen.

C.    SUMMARY OF TESTIMONY

During the August 30, 2012, hearing, plaintiff testified; and Dr. John McGowan, a vocational expert, testified at the request of the ALJ.

1.    Plaintiff's testimony.

At the time of the hearing, plaintiff was 28 years of age and is currently 31 (Tr. at 34). Plaintiff alleges he became disabled on April 30, 2010 (when he was 26 years of age), because on that day he attempted suicide and went into the hospital for treatment of his disorders (Tr.

21

at 33).  The counselors at the hospital told him he should apply for disability (Tr. at 33).
Plaintiff is 5'10" tall and weighs 195 pounds (Tr. at 34).  He is right handed (Tr. at 34).

At the time of the hearing plaintiff was single but had a baby due in less than a month
(Tr. at 34).  Plaintiff had recently moved to Kansas City, about three months earlier (Tr. at 34,
52).  He had been living with his girlfriend's parents in Columbia but overstayed his welcome
(Tr. at 34-35).  Plaintiff is now living with his girlfriend's sister in a house (Tr. at 35).  There
are multiple other people living in the house (Tr. at 35).  Plaintiff has known these people for
11 years so he gets along fine with them (Tr. at 52).  He is not very good at making friends and
talking to new people (Tr. at 52).

Plaintiff had no source of income (Tr. at 35).  His mother helps him some with money
for personal items and gas (Tr. at 35).  Plaintiff drove to the hearing (Tr. at 35).  His
grandfather bought him a car (Tr. at 35).  Plaintiff also donates plasma for money sometimes
(Tr. at 36).

Plaintiff has an 11th grade education (Tr. at 36).  He has a hard time focusing on the
words when he is reading (Tr. at 36).  He has to read things a couple times (Tr. at 36).

Plaintiff last worked in August 2009 (Tr. at 36-37).  Plaintiff was let go because his
medications made him drowsy and he was not doing much of his job (Tr. at 37).  He was asked
about being accused of trying to pass a counterfeit bill, and he said it was a $20 bill with which
he tried to buy cigarettes.  The bill was fake although he had gotten it from the bank.  The
police were called, but he was never charged (Tr. at 37).  Plaintiff started working as a
dishwasher in 2002 and later that year he became a line cook (Tr. at 37).  He worked the grill
or the fryer until that business closed (Tr. at 37, 38).  At the next restaurant, he made pizzas
and spaghetti (Tr. at 37).  After that he always worked in Italian restaurants so he made pizzas
and pasta (Tr. at 37-38).  There would be a saute  station, fry station, pizza station, etc. (Tr. at

61). Someone would call off what had to be made, and each person would go his own way and make what he needed to make to fill the order (Tr. at 61). When plaintiff was a teenager he worked at a fast food restaurant for a few months, taking orders and working the cash register (Tr. at 38-39).

After plaintiff was let go from his last job, his dad got sick and plaintiff took care of him in exchange for his father paying for his rent and other expenses (Tr. at 38). This occurred in 2009 and 2010 until plaintiff's dad passed away on April 3, 2010 (Tr. at 38). Plaintiff stopped working both because of his impairments and because his dad was sick and needed his help (Tr. at 39). Plaintiff's drowsiness from his medications is what caused him to be unable to work, and his girlfriend actually did most of the work helping his dad out because of plaintiff's drowsiness (Tr. at 39). Plaintiff would hold his dad's arm so he could walk to the bathroom or he would drive his girlfriend to the store so she could get his dad groceries (Tr. at 39, 40).

Plaintiff's ADHD makes it hard to focus -- when he is not sleepy, he is "bouncing around" (Tr. at 40). His bipolar disorder makes him either really manic and full of energy or extremely tired and depressed (Tr. at 40). Plaintiff has symptoms of bipolar disorder every day, most often the depressed kind (Tr. at 40). At the time of the hearing plaintiff was taking Lamictal, Effexor and Klonopin which he described as "the best ones I've tried in a long time" (Tr. at 45). Plaintiff has to take the Lamictal at bedtime because it makes him too drowsy if he takes it during the day (Tr. at 45). Plaintiff attempted suicide in the past (Tr. at 46). He was in therapy, but by the time of the hearing he was not in therapy anymore (Tr. at 46). He said he was doing a lot better (Tr. at 46). "I was on a medication called Depakote and apparently it doesn't mix very well with my family, because my father also had the same thing. He was on Depakote and attempted suicide. So we immediately got me off of that and on other stuff." (Tr. at 46). Plaintiff was switched to Lithium which worked well but gave him tremors (Tr. at 46).

23

Then he was switched to Lamictal and the tremors resolved (Tr. at 46-47). Even though Effexor works well, he still has bouts of depression (Tr. at 56). When that happens, he just stays in bed and thinks about how bad everything is (Tr. at 56). These bouts of depression last one or two days and occur at least once a month (Tr. at 57). When plaintiff has a manic episode, he does not sleep, he starts projects like vacuuming or doing dishes but does not finish them, and he draws a lot (Tr. at 57). These manic episodes last two or three days and occur two or three times a month (Tr. at 57).

On December 30, 2003, plaintiff was 18 and was in a car making a left turn and a 15-year-old driver in a Chevy 350 ran a red light and slammed into plaintiff's car (Tr. at 40). He broke his femur (Tr. at 40). They used two or three pins in his hip to hold a titanium rod in place (Tr. at 48). This hurts all the time now -- he is unable to stand up for more than 35 to 45 minutes at a time without severe pain (Tr. at 41). He does not like to take pain medications because of the drowsiness (Tr. at 41). He takes Tylenol for his pain (Tr. at 58). Plaintiff described how this pain has affected his work:

> I've always been a cook, so like standing up is, is more impaired by my leg because they, you know, they hollowed it out and put titanium from hip to knee and it sticks out of my hip just a little bit and that's what hurts the most. So standing up is hard in, in that case and then focusing on paperwork or anything like that at a different kind of job is hard because I can, I'm not very good at writing and like I can't, like I said I have to read it two or three, four times before I comprehend what I'm reading.

(Tr. at 41).

Plaintiff can walk for about a mile (Tr. at 48). He does not need an assistive device if he doesn't walk too far (Tr. at 49). If his hip starts hurting when he walks, he has a cane he can use (Tr. at 49). He does not use it very often (Tr. at 49). Plaintiff can sit for a while, but then he gets antsy due to his ADHD (Tr. at 50). Bending his knee hurts due to the titanium rod (Tr. at 50).

In February 2012 (about six months before the hearing), plaintiff went to the hospital because he was concerned he had re-injured his hip (Tr. at 41). He was helping his friend work on his car (Tr. at 41). He was supervising his friend while he was changing the front brakes (Tr. at 51). Plaintiff leaned down to pull the rotor off and pulled a muscle (Tr. at 51). He did not break anything, he had strained a muscle next to where his surgery had been (Tr. at 42).

In March 2012 plaintiff got into a fight and had an orbital fracture which was repaired with reconstructive surgery (Tr. at 49). Now if he looks up or down too far, he gets double vision (Tr. at 49). He moves his head instead of his eye, so he does not have many problems with that (Tr. at 49-50).

Plaintiff smokes a half a pack of cigarettes per day (Tr. at 47). In plaintiff's medical records dated March of 2012, it says that he had a history of misusing his prescription drugs within the past 12 months -- that referred to when plaintiff took all of his prescription medications in a suicide attempt in 2011 (Tr. at 47). When plaintiff was a teenager, he "was stupid and got in trouble" and had to participate in a 12-week drug counseling program (Tr. at 47-48).

Plaintiff sleeps 10 to 12 hours each night, but he wakes up every hour or so (Tr. at 51). He has bad dreams and he wakes up in a panic attack (Tr. at 51). This happens two to three times a week (Tr. at 51). Plaintiff spends his day sitting on the back porch and playing ball with his dog (Tr. at 52). He only spends about 20 minutes at a time watching television or playing on the computer (Tr. at 52). Plaintiff's sister does his laundry because he has never operated a washing machine (Tr. at 53).

Plaintiff finds it difficult to do something simple like make a grilled cheese sandwich, even if he has the steps written down (Tr. at 52-53). He tends to skip steps because he thought

he already did that step, or he misses steps when he reads the directions (Tr. at 53).

Plaintiff goes to the grocery store with his sister (Tr. at 54). It takes him at least an hour to shop because he does a lot of backtracking instead of getting everything he needs from each aisle before moving onto the next (Tr. at 54).

Plaintiff does not believe he can work because he does not like to work around people, but if he is left by himself then he just goes off and does his own thing instead of what he is supposed to be doing (Tr. at 55).

## 2.    Vocational expert testimony.

Vocational expert John McGowan testified at the request of the Administrative Law Judge. Plaintiff's past relevant work includes cook at an Italian Restaurant, DOT 313.361-014, which is medium exertional level with an SVP of 7 (skilled) (Tr. at 60).

The first hypothetical involved a person who could perform work at any exertional level but would be required to perform only simple unskilled types of work. The person should not perform production rate work but could do goal-oriented work. The person would need a low-stress environment defined as no more than occasional work changes or use of judgment (Tr. at 61). The person could have only occasional contact with coworkers and supervisors and no contact with the public (Tr. at 63). The only previous jobs plaintiff had that were "simple" were dishwasher and fast food worker, but the hypothetical person could not perform these jobs because they require constant contact with people and continual changes (Tr. at 62). The person could work as a warehouse packager, DOT 920.687-134, medium, unskilled with an SVP of 2. There are 777,630 such jobs in the country and 8,000 in Missouri (Tr. at 63). The person could work as a grounds keeper, DOT 406.687-010, medium, unskilled. There are 859,000 in the country and 7,380 in Missouri (Tr. at 63-64). The person could work as a

Case 4:13-cv-01199-REL   Document 29   Filed 05/01/15   Page 26 of 33

small parts assembler, DOT 706.684-022, light, unskilled with an SVP of 2 (Tr. at 64). There are 235,410 in the country and 7,660 in Missouri (Tr. at 64).

The second hypothetical was the same as the first except the person could only perform light work and would have to work at a slow pace (Tr. at 65). Such a person could work as a cleaner of commercial buildings, which is light janitorial work (Tr. at 66). This position is light, unskilled with an SVP of 2, and DOT 323.687-014. There are 1,175 light janitorial jobs in Missouri. The national number is 917,000, but that includes janitorial jobs that have a heavier exertional level (Tr. at 67). The vocational expert estimated that 1/4 of the total number of national jobs would be light, which is approximately 204,000 (Tr. at 67-68). The hypothetical person could work as a routine hand packager inspector, DOT 784.687-042, light, unskilled with 321,000 in the country and 420 in Missouri (Tr. at 68). The person could work as a garment sorter, DOT 222.687-014, light, unskilled with an SVP of 2 (Tr. at 70). There are 46,200 jobs in the country and 670 in Missouri (Tr. at 70).

The third hypothetical involved someone who is limited to light work, would need frequent supervision, could tolerate only occasional contact with coworkers and no contact with the public, and the person would be off task 20% of the day (Tr. at 72). The vocational expert testified that there are no jobs that permit someone to be off task 20% of the day other than in sheltered workshops (Tr. at 72).

With the economy the way it is, employers now will tolerate at most one sick day per month, sometimes not even that (Tr. at 73).

## V.     FINDINGS OF THE ALJ

Administrative Law Judge Debra Denney entered her opinion on September 8, 2012 (Tr. at 11-24). Plaintiff's last insured date was March 31, 2015 (Tr. at 13).

Step one.  Plaintiff has not engaged in substantial gainful activity since his alleged onset date (Tr. at 13).  Plaintiff worked after his alleged onset date but his earnings were below substantial gainful activity (Tr. at 13).

Step two.  Plaintiff suffers from the following severe combination of impairments: status post right femur fracture with hardware placement, status post right radial head fracture, bipolar 1 disorder, anxiety disorder, and history of attention deficit hyperactivity disorder (Tr. at 13-14).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 14-16).

Step four.  Plaintiff retains the residual functional capacity to perform work at all exertional levels except that he can perform only simple and unskilled work, he cannot perform production rate work but can perform goal-oriented work, he needs a low stress environment defined as no more than occasional work changes or use of judgment, he can only occasionally have contact with co-workers or supervisors, and he can have no contact with the public (Tr. at 16).  With this residual functional capacity, plaintiff is unable to perform his past relevant work as a dishwasher, fast food worker, or cook (Tr. at 22).

Step five.  Plaintiff is capable of performing other work available in significant numbers such as warehouse packager, groundskeeper, small parts assembler, cleaner, hand packager inspector, or garment sorter (Tr. at 23-24).  Therefore, plaintiff is not disabled (Tr. at 24).

## VI.    WEIGHT GIVEN TO OPINION OF DR. DOS SANTOS

Plaintiff argues that the ALJ erred in discounting the opinion of Dr. Dos Santos that plaintiff would likely miss one or two days of work per month due to episodes of mood changes.

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005). If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give the opinion including length of the treatment relationship and the frequency of examination; nature and extent of the treatment relationship; supportability, particularly by medical signs and laboratory findings; consistency with the record as a whole; and other factors, such as the amount of understanding of Social Security disability programs and their evidentiary requirements or the extent to which an acceptable medical source is familiar with the other information in the case record. 20 C.F.R. §§ 404.1527, 416.927.

The ALJ gave the opinion of Dr. Dos Santos partial weight (Tr. at 21).

In September 2012, Dr. Santos opined that the claimant would be estimated to miss 1-2 days of work per month, but that opinion stands alone with limitations that were not mentioned in Dr. Santos' numerous records of treatment and are not supported by objective testing or reasoning which would indicate why the claimant's functioning need be so restricted. Dr. Santos['s] treatment notes do not support this opined limitation. As noted above, Dr. Santos assigned GAF scores of 62-75 throughout his treatment. These scores are indicative of only slight impairments and generally good functioning, which is contrary to Dr. Santos' September 2012 opinion. Additionally, Dr. Santos['s] treatment notes do not include indications of abnormalities in orientation, thought content, appearance, thought process, judgment, insight, psychomotor activity, speech, concentration, recall, cognitive functioning, auditory hallucinations, visual hallucinations, suicidal ideation, or homicidal ideation that would be supportive of Dr. Santos' limitations. The evidence generally supports the opinions included in Dr. Santos' treatment notes but his September 2012 opinions are not support[ed] by his own treatment notes, which renders that opinion less persuasive.

(Tr. at 21).

As the ALJ pointed out, Dr. Dos Santos's treatment records do not support a finding that plaintiff would miss one to two days of work per month due to episodes of mood swings. In

Case 4:13-cv-01199-REL   Document 29   Filed 05/01/15   Page 29 of 33

fact, his records reflect very few observations that were not normal. Those abnormal observations are noted below in red:

During a mental status exam performed by Dr. Dos Santos on February 23, 2011, he found that plaintiff had good eye contact; his speech was normal in volume, tone, and rate; his attention and motor activity were within normal limits; his thoughts were organized and coherent; he was alert and oriented as to person, place, time, and circumstances; his memory for past and recent events was normal; his intelligence seemed of average range; insight and judgment were good.

On March 24, 2011, he noted that plaintiff's mood was pretty good, he was applying for jobs in restaurants. "He says that sometimes has some downs but not really bad." His thoughts were organized, mood and affect were appropriate. Dr. Dos Santos assessed "mood stable." On May 6, 2011, plaintiff's thoughts were organized, mood and affect appropriate. On June 20, 2011, thoughts were organized, mood was only mildly depressed. On July 18, 2011, plaintiff said his mood was stable. Dr. Dos Santos observed that plaintiff's thoughts were organized, his mood and affect were appropriate, and he assessed stable mood. On August 12, 2011, plaintiff said he was doing alright. Dr. Dos Santos observed that plaintiff's thoughts were organized, his mood and affect were appropriate "although sometimes sad" which was based on plaintiff's report, not on Dr. Dos Santos's observation.

On September 12, 2011, plaintiff's thoughts were organized, mood and affect appropriate. On November 10, 2011, his thoughts were organized, his mood was anxious and depressed. On December 1, 2011, his thoughts were organized, mood was anxious. On January 2, 2012, plaintiff was taking more Clonazepam than prescribed. He reported having been a little manic for two or three days. This was the first mention of a manic episode in any of the medical records. Dr. Dos Santos did not observe any signs of mania. Plaintiff's mood

30

was good, thoughts organized. On April 17, 2012, plaintiff's thoughts were organized and his mood and affect were appropriate. On May 14, 2012, his thoughts were organized, mood was depressed, affect was appropriate. On July 24, 2012, plaintiff said he was doing alright. His thoughts were organized and coherent, mood was stable, affect appropriate.

Not only do Dr. Dos Santos's treatment records fail to support his opinion in the September 4, 2012, letter, none of the other treatment records support it either.

On November 4, 2009, psychiatrist Dr. Weng found that plaintiff had appropriate appearance, a cooperative attitude, normal speech, intact thought process, no hallucinations, no delusions, no suicidal ideation, no homicidal ideation. He was calm and fully oriented. His long and short term memory were normal. His cognitive functioning was normal including general knowledge, IQ, serial sevens/calculations and abstract thinking. Although he claimed to be moody and Dr. Weng noted poor insight/judgment, plaintiff had been on no psychiatric medications for some time.

On December 2, 2009, after a month of being on Depakote and Klonopin, plaintiff was observed to look well. He said he felt well and had no medication side effects. Dr. Weng found that plaintiff was "doing well." On December 14, 2009, Dr. Weng observed that plaintiff looked well but plaintiff complained about getting fired and being sued. Dr. Weng found that plaintiff looked well and felt well on January 14, 2010; March 11, 2010; May 6, 2010; June 3, 2010; August 16, 2010; November 11, 2010; and January 11, 2011. Dr. Weng made no abnormal observations during his course of treating plaintiff.

Plaintiff's non-psychiatric treatment is also in accord with the very mild findings in the treatment records of Dr. Wang and Dr. Dos Santos. On April 8, 2011, plaintiff was in the emergency room after having a bike accident; and he denied anxiety, depression and sleeping problems. He was observed to be cooperative with appropriate mood and affect. On April 23,

2011, he overdosed after he got into a fight at a gas station, had an argument with his wife over not having a job, was under the stress of living with seven other people, and the first anniversary of father's death was coming up. He was discharged less than two days later. On January 25, 2012, in the urology department, plaintiff denied mood swings. On March 22, 2012, Dr. Chang observed normal mood and affect. On April 21, 2012, in the emergency room, plaintiff was noted to be cooperative, alert, and fully oriented.

Joan Singer, Ph.D., a non-examining psychologist, found only mild restriction of activities of daily living; mild difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence or pace. "His impairments are significant but they do not limit claimant's functioning to the degree that would preclude at least simple, repetitive jobs." She specifically found that plaintiff was not significantly limited in his ability to maintain regular attendance.

Finally, I note that Dr. Dos Santos never recommended that plaintiff participate in therapy which suggests that he did not believe plaintiff's symptoms were of such severity to cause disability. His treatment sessions each lasted 15 minutes, as reflected in the treatment notes; therefore, it is clear that he provided no therapy.

I find that the substantial evidence in the record supports the ALJ's decision to discredit the opinion of Dr. Dos Santos that plaintiff would likely miss one to two days of work per month due to episodes of mood swings.

## VII.   CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen

ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
April 30, 2015

Case 4:13-cv-01199-REL   Document 29   Filed 05/01/15   Page 33 of 33